UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 3:15CR147 (JCH) |
| v. | : | |
| | : | |
| MATTHEW GOLDREICH | : | October 27, 2015 |

**Memorandum in Aid of Sentencing**

The defendant, Matthew Goldreich, used his media company to produce and air blatantly false advertisements for home mortgage loan modification services during the heart of the national mortgage crisis. As a result of the defendant's advertisements, struggling homeowners across the United States lost their savings to unscrupulous clients of the defendant's media company. Worse, some are in danger of losing their homes. These victims deserve justice, and this defendant deserves a sentence that adequately reflects his conduct, including a term of community confinement and a $100,000 fine.

**I.     Facts and Circumstances of the Defendant's Conduct**

The facts underlying the defendant's conviction are set out accurately in the presentence report ("PSR"), and adopted by the government with certain supplementary details as follows. The defendant is the President and Chief Executive Officer of National Media Connection, LLC ("National Media Connection"), a media and advertising company based in New London, Connecticut. National Media Connection produces commercials to air on television and radio and to be posted on the Internet. The commercials generate "leads" for National Media Connection's clients.

1

A.  **The Defendant Produced Advertisements for a Fictitious Company**

Between approximately May 2009 and February 2013, National Media Connection produced and disseminated commercials across the United States for the National Mortgage Help Center, LLC ("NMHC"). Despite its name, NMHC was not a national association subject to regulation by the federal government. Instead, NMHC was a limited liability company incorporated in Connecticut by the defendant on May 20, 2009. NMHC had no employees, customers, or business operations; it was a shell company that existed only on paper.

The defendant created NMHC to capitalize on the Home Affordable Modification Program ("HAMP") announced by the United States Department of the Treasury on or about March 4, 2009. HAMP consisted of a number of incentives to encourage struggling homeowners and financial institutions to modify existing loans on owner-occupied primary residences in order to help keep these properties out of foreclosure.

Through National Media Connection's commercials, the defendant represented NMHC to the public as a business entity engaged in the loan business, namely home mortgage loan modifications. The defendant personally developed the idea for the NMHC campaign and wrote the copy for the commercials. The defendant advertised NMHC as having trained specialists available to help modify the mortgages of homeowners who were struggling to make their mortgage payments. The advertisements included toll-free telephone numbers for mortgage borrowers to call for help modifying their mortgages. Some advertisements claimed

that NMHC could obtain "rates as low of 1%." In other advertisements, purported clients stated, among other things, that NMHC "cut my interest rate in half" or "cut my interest rate from 7.25% to just 2%." Many of the advertisements also falsely depicted NMHC as affiliated with the federal government, including through references to government stimulus programs and the use of President Barack Obama's image.

For example, one video advertisement stated: "Attention homeowners. We know it's tough out there. And while America's homeowners are facing more challenges than ever before, the National Mortgage Help Center is ready to help." Then, over footage of President Obama, the video stated: "A new government stimulus now offers incentives to your mortgage company to work with us on your behalf." The video also stated: "We may be able to lower your rate to as low as 1% and cut your mortgage payment in half. Our trained specialists know all the new regulations to get you quick relief. We help thousands of homeowners every day."

Another video stated: "Attention homeowners. Struggling to pay your mortgage? Is your house now worth less than what you owe? The National Mortgage Help Center may be able to help you." Over footage of President Obama, the video then stated: "The recent government bailout includes a plan to help struggling homeowners and our trained specialists know how to make it work for you." The video also stated: "We help thousands of struggling homeowners every day and we want to help you, too. . . . Call the National Mortgage Help Center right now!"

A third video advertisement included apparent testimonials of NMHC clients. The video included the tag line "Actors Portraying Real NMHC Clients" and made representations about the help that NMHC provided to clients. For example, the video represented that one supposed client had a reduction in mortgage payments from $830 a month to less than $300 per month and that another supposed client "cut my interest rate from $7.25% to just 2%."

In truth, NMHC was not affiliated with the federal government, had no actual clients, did not provide mortgage modification services for any homeowners, and operated only as a front. Homeowners who called the toll-free telephone numbers advertised for NMHC were routed to National Media Connection's clients. The clients, in turn, paid National Media Connection for these leads. Under the pretense of helping homeowners modify their mortgages, certain National Media Connection clients then charged the homeowners fees and provided no services whatsoever in return. To date, the government has identified three such clients: (1) First One Lending Corporation ("First One"); (2) East Coast Fidelity LLC ("East Coast Fidelity"); and (3) NPV Test LLC ("NPV Test").[1]

National Media Connection did no (or minimal) due diligence on its clients and, with rare exception, did not ascertain that clients were in fact providing the services advertised. In fact, in some instances, National Media Connection did not even know who their clients were; the clients were brought in by brokers on an

---

[1] The defendant states repeatedly in his sentencing memorandum that First One was the only National Media Connection client who scammed homeowners calling in response to the NMHC commercials. That is simply not accurate. There were at least three, and the government is continuing to investigate whether there were others.

4

anonymous basis. First One was one such client. Until February 2012, National Media Connection knew First One only as "Client 359."

Certain NMHC videos included small-font disclaimers that flashed for a few seconds at the end of the commercial, but the statements in the disclaimers conflicted with other statements made throughout the commercials. The disclaimers stated that NMHC was a "third party referral source," that NMHC was not affiliated with the federal government, and that "[c]alls may be answered by companies other than National Mortgage Help Center." But not all television commercials included these disclaimers. The radio advertisements did not include disclaimers either.

### B. The Defendant's Clients Defrauded Struggling Homeowner-Victims

The defendant's clients stole approximately $102,787 from at least 70 different homeowner-victims in increments of $175 to $5,975. These figures almost certainly are underinclusive, as they are based largely on individuals who made complaints to the Federal Trade Commission ("FTC") and thus do not include the likely scores of victims who did not have the knowledge or wherewithal to lodge a formal complaint with the FTC.

While homeowners were losing money to scams run by National Media Connection's clients, the NMHC commercials were generating substantial revenues for the defendant and National Media Connection (although the government does not have information about total profits). The prices paid by National Media Connection's clients varied (depending, in part, on how many states they wanted

5

telephone calls from), but National Media Connection typically charged about $40 per lead. During the peak of the NMHC campaign, the advertisements generated hundreds, or even thousands, of calls per day, and National Media Connection employees described the NMHC campaign as a very successful one. In 2010, during the peak of the campaign, the defendant earned an average of $70,000 per month.[2]

### C. The Defendant Continues to Advertise for Fake Companies that Do Not Exist

In April 2013, the defendant, National Media Connection, and NMHC were sued in the Central District of California by the Neighborhood Assistance Corporation of America ("NACA"), a non-profit organization based in Boston that provides no-cost mortgage modification services primarily to low-income homeowners. NACA alleged that the defendant's false advertisements were driving homeowners to scammers and, as a result, making the homeowners skeptical and unwilling to take advantage of the legitimate, free services offered by NACA.

The NACA lawsuit concluded with a consent decree in October 2013. As part of the resolution, the defendant was enjoined from, among other things, "[r]epresenting to the public or a third party that any of the Defendants, or any entity owned by, controlled by, affiliated with or created as a fictitious business name by any of the Defendants, offers or provides services related to loan modifications, foreclosure defense, or mortgage assistance."

---

[2] According to Goldreich's mortgage application to Hudson City Savings Bank in 2010, he earned on average $70,000 a month, which would equate to income of $840,000. His personal financial success continued throughout the duration of the NMHC campaign. In 2013, the defendant made at least $882,322.91 from National Media Connection. According to State of Connecticut wage records, Goldreich earned $374,000 in wages in 2013. Additionally, National Media Connection paid $508,322.91 toward the cancellation of Goldreich's personal home mortgage that year.

6

Despite the terms of the consent decree, by March 2015, the defendant and National Media Connection were advertising for the Reverse Mortgage Connection.[3] A reverse mortgage is a type of home loan that allows homeowners age 62 or older to tap into their home equity: the homeowner receives cash up front from a lender, who is repaid when the homeowner dies or sells the home or when the home ceases to be the homeowner's primary residence. The defendant advertised the Reverse Mortgage Connection as an actual company with a corporate logo and telephone number. The commercials urged seniors to "call the Reverse Mortgage Connection right now." Some commercials stated that "now is the perfect time for you to improve your lifestyle with a government-insured reverse mortgage from the Reverse Mortgage Connection."

In truth, the Reverse Mortgage Connection does not exist—even on paper. It is not a real company. When seniors called the advertised telephone number, they were routed to clients of National Media Connection. The government's understanding is that the Reverse Mortgage Connection commercials continue to air today.

### D. The Defendant Has Advertised for Other Fictitious Companies in the Past

NMHC and the Reverse Mortgage Connection are not the only non-existent or shell companies the defendant has used to sell leads. For example, around

---

[3] The defendant's position is that the Reverse Mortgage Connection commercials did not violate the terms of the NACA consent decree. The defendant's "proof" comes from a privately-retained lawyer (whom he apparently seeks to qualify as an expert) and his own counsel from the NACA litigation. The government's view is that the terms of the consent decree are plain on their face, and that it is for the Court to interpret them and assess their relevance to this case.

March 2010, the defendant began advertising debt relief services for Debt Help Center USA, LLC ("Debt Help Center USA"), a shell company he incorporated as a limited liability company in Connecticut. These advertisements, like the NMHC commercials, falsely suggested an affiliation with the federal government (including through footage of President Obama) or at least that Debt Help Center USA was a national association.

Mortgage loan modifications and reverse mortgages also are not the only services that the defendant and National Media Connection advertised to vulnerable segments of the consumer population. Indeed, many of National Media Connection's advertising campaigns are for products (or "verticals," as the company calls them) that are targeted at low-income, elderly, or otherwise vulnerable consumers, such as end-of-life insurance, debt relief, addiction-related services, and tax settlements.

## II. Sentencing Guidelines

### A. The November 1, 2014 Manual Currently in Effect

The government agrees with the Guidelines calculation in the PSR, as follows. The defendant's base offense level under U.S.S.G. § 2B1.1(a)(2) is 6. Eight levels are added because the loss in this case is $102,787 and thus exceeds $70,000. U.S.S.G. § 2B1.1(b)(1)(E). Four levels are added because the offense involved 50 or more victims. U.S.S.G. § 2B1.1(b)(2)(B). Another 2 levels are added under U.S.S.G. § 3A1.1(b)(1) because the defendant knew or should have known that a victim of the offense was a vulnerable victim. Three levels are subtracted for acceptance of

responsibility under U.S.S.G. § 3E1.1, resulting in a total offense level of 17.

Because the defendant has no criminal history, his Guidelines range is 24 to 30 months of imprisonment. However, because the misdemeanor with which the defendant has been charged has a maximum one-year term of imprisonment, his effective Guidelines sentence is 12 months' imprisonment.

### B.    The Proposed November 1, 2015 Amendments

The government notes that the Sentencing Guidelines amendments scheduled to take effect on November 1, 2015 do not change the defendant's total offense level but do impact the analysis. Under the proposed amendments, the defendant still would have a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2). Eight levels would be added U.S.S.G. § 2B1.1(b)(1)(E) because the loss exceeds $95,000. Two levels would be added U.S.S.G. § 2B1.1(b)(2)(A)(ii) because the defendant's offense was committed through mass marketing. Another 4 levels would be added because the defendant knew or should have known that his offense involved a large number of vulnerable victims. U.S.S.G. § 3A1.1(b)(2). Finally, Finally, 3 levels would be subtracted for acceptance of responsibility under U.S.S.G. § 3E1.1, resulting in a total offense level of 17.

### C.    Vulnerable Victims

Assuming the November 1, 2015 amendments take effect as scheduled, the defendant would qualify for a sentencing enhancement under U.S.S.G. § 3A1.1(b)(2) because his offense involved a large number of vulnerable victims. His victims' precarious financial condition and housing worries made them unusually

susceptible to the false promise of the defendant's mortgage modification advertisements. *See United States v. Sinnott*, 523 F. App'x 807, 810 (2d Cir. 2013) (victims' financial status made them unusually vulnerable); *United States v. Borst*, 62 F.3d 43, 46 (2d Cir. 1995) (same); *see also United States v. Fordham*, 400 F. App'x. 758, 760 (4th Cir. 2010); *United States v. Holmes*, 60 F.3d 1134, 1136-37 (4th Cir. 1995).

Neither the Sentencing Guidelines nor the Second Circuit has defined what constitutes a "large number" for purposes of this enhancement. *See United States v. Peirce*, 357 F. App'x 319, 323 (2d Cir. 2009) (not reaching issue). But the Sentencing Commission's background note explains that the enhancement "implements, in a broader form, the instruction to the Commission in section 6(c)(3) of Public Law 105-184." U.S.S.G. § 3A1.1(b)(2) Background Note. That instruction calls for "an additional appropriate sentencing enhancement for cases in which a large number of vulnerable victims, including but not limited to victims described in section 2326(2) of title 18, United States Code, are affected by a fraudulent scheme or schemes," Pub. L. No. 105-184, 112 Stat. 520 (1998) (the "Telemarketing Fraud Prevention Act"). In turn, the cited statute, 18 U.S.C. § 2326(2), provides an increased prison term for telemarketing offenses that victimize "ten or more persons over the age of 55." 18 U.S.C. § 2326(2). Because Congress, in the Telemarketing Fraud Prevention Act, thus used telemarketing offenses involving ten or more persons as an example of cases involving a large number of vulnerable victims, and because U.S.S.G. § 3A1.1(b)(2) implements the instructions in the Telemarketing

Fraud Prevention Act "in a broader form," the term "large number" in § 3A1.1(b)(2) can be understood to be the same as used in the Telemarketing Fraud Prevention Act—that is, "10 or more" victims.

Indeed, courts have applied and upheld the application of U.S.S.G. § 3A1.1(b)(2) in cases involving between 10 and 50 vulnerable victims. *See, e.g.*, *United States v. Williams*, 547 F. App'x 251, 259 nn.9, 20 (4th Cir. 2013) (defendant who targeted 46 individuals with poor credit ratings qualified for enhancement); *United States v. Price*, 434 F. App'x 98, 100 (3d Cir. 2011) (defendant who prostituted over 40 minors qualified for enhancement); *United States v. Caballero*, 277 F.3d 1235, 1251 (10th Cir. 2002) (upholding enhancement based on testimony of 16 victims); *United States v. Kaufman*, No. 04-40141-02, 2009 WL 4110367, at *5 (D. Kan. Nov. 23, 2009) (12 victims); *cf. United States v. Moskal*, 211 F.3d 1070 (8th Cir. 2000) (affirming upward departure under U.S.S.G. § 5K2.0 based on "large number of vulnerable victims" in mail fraud involving approximately 30 victims).

An alternate reading of § 3A1.1(b)(2) is that "large number" means "50 or more." This reading draws support from the structure of the Guidelines. Due to "double counting" concerns, the enhancements in U.S.S.G. §§ 2B1.1(b)(2)(B) (50 or more victims) and (C) (250 or more victims) cannot be applied alongside the "large number of vulnerable victims" enhancement in § 3A1.1(b)(2). *See* U.S.S.G § 2B1.1 Application Note 4(D). If 50 or more victims does not qualify as a "large number" capable of triggering § 3A1.1(b)(2), there would be no need for the Guidelines to

prohibit the application of this enhancement alongside § 2B1.1(b)(2)(B).[4]

In this case, there is no need for the Court to resolve which of these competing readings is correct, because the defendant's offense harmed a minimum of 70 vulnerable victims. That is sufficient to trigger the "large number" enhancement under either interpretation of § 3A1.1(b)(2).

## III. Sentencing Factors

Consideration of the Sentencing Guidelines and the statutory factors in 18 U.S.C. § 3553(a)(1)-(2) demonstrate that the defendant's crime warrants a term of community confinement and a substantial fine. The most relevant factors are addressed here.

### A. Seriousness of the Defendant's Crime

The brazenness of the defendant's crime—and its impact on scores of homeowners across the United States during the peak of the national mortgage crisis—calls for more than a slap on the wrist. The statute of conviction, 18 U.S.C. § 709, is meant to protect the public by preventing companies in various key industries, including, as relevant here, the loan business, from passing themselves off as affiliated with, or regulated by, the federal government. *See United States v. U.S.I.A. Homes, Inc.*, 409 F. Supp. 483, 485 (E.D.N.Y. 1976). The defendant asserts that he "unintentionally violated a statute of which he was unaware by using the

---

[4] The Guidelines amendments scheduled to take effect on November 1, 2015, alter §§ 2B1.1(b)(2)(B) and (C) by eliminating the "50 or more victims " and "250 or more victims" provisions and instead providing enhancements for offenses resulting in substantial financial hardship to, respectively, 5 or more victims and 25 or more victims. The amendments nevertheless leave intact the prohibition on applying §§ 2B1.1(b)(2)(B) or (C) alongside § 3A1.1(b)(2), which suggests that, in some circumstances, 5 or more vulnerable victims might qualify as a "large number."

word 'national,'" Def's Sen. Mem. at 2, but this is not some technical violation. The defendant's NMHC commercials contained outright lies and were scripted to give homeowners a false sense of security. By incorporating NMHC and running advertisements falsely portraying it as a loan modification agency connected to the federal government, the defendant confused and misled homeowners into believing they were calling and paying money to a legitimate, nationally-organized entity that was subject to strict regulation, not a shell company selling them to the highest bidder. That is *precisely* the danger that 18 U.S.C. § 709 is intended to counter.

It was entirely foreseeable that at least some of the third-party companies that chose to advertise through the defendant's NMHC commercials were scammers, because the commercials themselves were lies. The defendant now asserts that he and National Media Connection did due diligence on clients, but that claim rings hollow for two reasons. First, it is contradicted by the defendant's own employees. Hank Tenney, National Media Connection's Creative Director and Vice President of Sales, informed the government that National Media Connection did *no* due diligence for the NMHC campaign. Second, the defendant's claim is undercut by the fact that National Media Connection often did not even know its clients' identities. In this environment, it was completely predictable that some of the defendant's clients were defrauding homeowners who called in response to the NMHC commercials. Goldreich's clients were companies and individuals who pretended to be an organization that did not exist—the National Mortgage Help Center. From the outset, Goldreich was on notice that these clients were willing to

lie to the homeowner-victims to make money. Goldreich connected his victims to his clients through fraudulent and deceptive means; he could only expect that his clients would continue to perpetuate those means.

The effect of the defendant's advertisements is best described by the victims themselves. One homeowner wrote:

> After seeing the defendant's add [sic] on TV, my wife and decided to contact his Company. They told us they could definitly [sic] solve our mortgage problem. After several phone conversations we sent a Money Order for $2,500 to get the paperwork started. $2,500 may not seem like a lot, but my wife and I are both dissabled [sic], and living on only my fixed income of SSDI and a small monthly insurance check. . . . Money got tight real fast.
>
> After the Defendant's Company got our Money Order we found it impossible to contact them, they would not return our calls and changed their phone number several times. . . . We were totally devistated [sic], that money was all we had in savings and could have been used to pay other debts.

Another wrote:

> I am on disability. I was looking for help to pay my mortgage. I saw an ad on TV for help with my monthly mortgage, I contacted the people and they promised to help my lower my mortgage so I would not lose my house. . . . [T]hey told me it would cost a total of $1200. . . . I almost lost my home and I became very depressed when I finally realized I was being scammed out of money I did not have in the first place.

As these letters reveal, homeowners who called in response to the defendant's NMHC commercials often did not know whether they were dealing with NMHC or some other (sometimes unnamed) company. All the homeowners knew was that they saw an advertisement for an entity that appeared trustworthy, and they were swindled by whomever answered their telephone call.

**B.     Respect for the Law and Adequate Deterrence**

It is important for the general public to understand that those who prey on vulnerable segments of the population, whether through false advertising or otherwise, will be prosecuted and punished accordingly. The defendant's NMHC commercials targeted financially insecure homeowners, reeled them in through false claims, and then passed them off to unscrupulous third parties who stole their money. There are real victims to this crime, and the need to promote respect for the law calls for a meaningful punishment that will not be perceived merely as a "cost of a doing business."

Similarly, there is a need to promote adequate deterrence. The defendant's October 22, 2015 letter to the United States Probation Office calls into question whether the defendant truly understands the gravity of his offense. In that letter, the defendant takes issue with the government's concern about his current advertising campaign for the Reverse Mortgage Connection, stating that "[t]here is no claim that reverse mortgages are illegal." That assertion misses the mark. There is nothing illegal about reverse mortgages, just as there is nothing illegal about mortgage modifications. But advertising for the Reverse Mortgage Connection—an entity that does not exist, even on paper—is misleading and raises serious legal questions. *See* 15 U.S.C. §§ 52(a)(2) and 54. The defendant must receive a sentence that drives home the message that false advertisements will not be tolerated, especially when they are aimed at vulnerable populations.

### C.  Just Punishment

The government is not advocating a period of incarceration, in part because the defendant is a first-time offender and was not the party that directly took funds from homeowner-victims. Although the defendant did not know what exact lies his clients were telling victims, he should not be allowed to hide behind a veneer constructed out of plausible deniability. The defendant produced wildly deceptive commercials, and his crime cost others their savings and jeopardized their homeownership. It is only fair that he pay a significant financial price and spend a period of time in community confinement outside the comfort of his home.

### D.  Restitution

Pursuant to 18 U.S.C. § 3663A, restitution is mandatory in this case. Although the defendant's offense resulted in a total loss of at least $102,787 to approximately 70 homeowners, some of these victims have already been made whole by First One. Like the defendant, First One was sued by NACA. As part of the settlement between First One and NACA, First One agreed to pay restitution to any homeowners from whom it had collected advance fees, provided no loan modification services, and then forwarded the homeowners' financial documents to NACA (without the homeowners' consent). Some of the victims in this case thus have already recouped their losses.

The government has filed a Motion to Enter Restitution Order that subtracts these victims from the loss amount, resulting in a total restitution amount of $75,794. This sum is owed to the following categories of victims: (1) victims of First

One whose files were not forwarded to NACA (and who thus were not subjects of the NACA lawsuit), but who nevertheless were connected to First One via the defendant's false advertisements for NMHC and who lost money to First One; (2) victims who were connected to and defrauded by *other* third-party companies known to have advertised through the defendant's media company, such as East Coast Fidelity and NPV Test; and (3) victims who could not recall or never knew the identity of the third-party company that defrauded them, but who *did* recall seeing an advertisement for NMHC.

## IV. Conclusion

The government urges the Court to impose a sentence that includes a term of community confinement and a $100,000 fine, which the government believes reflects the seriousness of the defendant's crime, promotes respect for the law and adequate deterrence, accounts for the defendant's personal history and characteristics, and serves the aims of 18 U.S.C. § 3553(a).

    Respectfully submitted,

    DEIRDRE M. DALY
    UNITED STATES ATTORNEY

    <u>/s/ Avi M. Perry</u>
    AVI M. PERRY
    LIAM BRENNAN
    ASSISTANT UNITED STATES ATTORNEYS
    United States Attorney's Office
    157 Church Street, 25th Floor
    New Haven, CT 06510
    avi.m.perry@usdoj.gov
    Tel: 203-821-3700
    Fax: 203-773-5377
    Federal Bar No. phv07156

CERTIFICATE OF SERVICE

      This is to certify that on October 27, 2015, a copy of the foregoing Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

      /s/ Avi M. Perry

      AVI M. PERRY
      ASSISTANT UNITED STATES ATTORNEY